**COMMERCIAL INSURANCE COMPANY OF NEWARK, NEW JERSEY, Appellant,**

v.

**William L. WRIGHT, Appellee.**

**No. 7977.**

Court of Civil Appeals of Texas, Texarkana.

June 23, 1970.

Rehearing Denied July 21, 1970.

Davis R. McAtee, Thompson, Knight, Simmons & Bullion, Dallas, for appellant.

John E. Collins, Mullinax, Wells, Mauzy, Levy & Richards, Dallas, for appellee.

DAVIS, Justice.

A Workmen's Compensation case. Appellee fell from a jeep vehicle on May 27, 1966, while in the course of his employment at Trans-Texas Airways in Dallas, Texas, landing or falling on concrete, or black asphalt, striking the same with his left wrist, forearm and elbow. Appellee did not see a doctor that day. The next day, he went to see the company physician, Dr. George Launey. A history of the injury was given to Dr. Launey. The heel of his left hand was skinned, there was a swelling inside his left arm about two inches above his watch band, his left wrist was sprained and swollen and there was an undisplaced fracture at the head of the radius of the left elbow. The fracture was discovered by x-ray. The fracture was treated with a binder and his left arm was put in a sling. He was given heat treatment and physical therapy. Dr. Launey

testified that: "There was an object or prominence in front of his wrist above the wrist joint". This was noticed the next day after the injury. Appellee was complaining of the swelling in his left wrist.

There had never been any pain or swelling of appellee's left arm at any time prior to the injury.

The history appellee gave Dr. Launey was that he was unable to flex or straighten his left elbow because of pain. Dr. Launey testified in reply to a question about "bruising or abrasions" as follows:

"A. Well, this was in 1966. I have no note in my notes that there was an abrasion, but there was swelling and tenderness, and he couldn't move his elbow".

Appellee returned to work in about three weeks, but his left arm continued to be painful. On April 24, 1967, the pain in his left elbow, the swelling in his arm and wrist became so severe that he had to return to Dr. Launey. At that time he gave Dr. Launey the following history according to the Statement of Facts:

"Q. Will you read to the jury the first two paragraphs, please sir?

A. The above thirty year old, white male reported today, April 24, 1967 for an examination and opinion with particular reference to pain in his left elbow and wrist, which he alleged has been present since an injury to his left elbow received May 27, 1966.

Q. Let me ask you one question about that, Doctor, if I interpret that correctly, does that mean that he complained to you, or told you at any rate, that since May 1966 and up until April 24, 1967, he had had pain in this left elbow and wrist?

A. Yes, that's right.

\* \* \* \* \* \*

Q. Now, I'll ask you to go to the bottom of the page on 'Interval History',

will you kindly read that paragraph, please.

A. The patient states that off and on since this time he has had an aching pain in his left elbow and left wrist. This is not present at all times, but at times keeps him awake at night. He also states that the swelling has been present in the front side of the left forearm, just above the wrist joint.

Q. Now, you're talking here about from the time of the accident up until the time you saw him again on April the 24th, (1967), are you not, Doctor?

A. That's right."

Dr. Launey further testified:

"Q. Now, you have indicated that there was a bruise there; does that indicate that maybe he might have also struck it? (meaning the wrist)

A. It could have been just a *bad sprain* along with the *fracture* trauma." (Emphasis added.)

Appellee was referred to Dr. Marvin Knight, an orthopedic surgeon who specializes in the treatment of the skeletal system, muscles, ligaments, nerves, and blood vessels pertaining thereto. He testified:

"Q. Do you consider yourself qualified insofar as the treatment and diagnosis of cancer with regards to these structures of the body is concerned?

A. No, sir, because I don't know anybody is."

Dr. Knight did a biopsy on the swelling area and discovered that it was a malignant cancerous trauma. He then amputated his left arm just above the elbow because of the malignant trauma. The tumor was classified as Rhabdomyosarcoma cancer of the skeletal muscle.

The appellant denied that the injury that occurred during the course of his employment was the cause of the cancer, or the trauma, and did not severely aggravate a

dormant existing condition that caused the appellee to lose his left arm.

The case was tried before a jury. There was only one Special Issue submitted:

"Do you find from a preponderance of the evidence that the plaintiff's injury on May 27, 1966, was a producing cause of the loss of plaintiff's left arm in May of 1967?"

The jury answered the special issue "yes". Judgment was entered in favor of appellee. Appellant has perfected its appeal and brings forward five points of error.

Appellant's points of error are multifarious and contain some statements of fact; but, we can construe the meaning of the points of error. They could be amended. Rule 431 Vernon's Ann.Tex.Rules of Civil Procedure. Actually, the points of error contend that the trial court erred in: (1) there is no competent expert medical testimony to support the jury's finding in answer to the special issue; (2) there was no expert medical testimony of a reasonable medical probability of a causal connection between the injury and the cancer; (3) the evidence failed to establish two of the seven criteria necessary to show a probable causal connection between trauma and cancer; (4) the evidence was insufficient to show a probative value to support the jury's finding that the injury on May 27, 1966, was a producing cause of the loss of the left arm in May 1967; and (5) the jury's answer is against the great weight and preponderance of the evidence to be manifestly wrong and unjust.

By points of error, appellant says in the first two points that there is no expert evidence to support the jury's findings and no expert medical evidence that there was a reasonable medical probability of a causal connection between the injury and the cancer. We must consider the evidence in the light most favorable to the jury's findings. The law is so clear on that that it is not necessary to cite authority. As pointed out in the foregoing history, appellee fell off of a jeep vehicle, landed on his left side either on concrete or black asphalt. He could not fully explain the way he fell but he described his injuries that the heel of his hand was skinned, the left wrist was sprained and it jammed his left arm into his elbow and fractured the head of the radius. He did not see a doctor that day. The fall occurred about three o'clock in the afternoon. He went to see the company doctor the next day. The next morning there was swelling in his elbow, a knot was protruding on the inside (belly) of his left arm about two or three inches above his watch band. His left wrist was swelling and he could not flex his left elbow. He further testified that Dr. Launey put a bandage on his left elbow and began treating him with heat and physical therapy. He prescribed medicine to relieve the pain. He put his left arm in a sling. The Doctor did not let him go back to work for three weeks and then he advised that he do only light work. Appellee further testified that the elbow and the swelling on the inside of his left arm and his wrist continued to give him trouble from the date of the accident, May 27, 1966, until April 24, 1967, when he had to go back to see the doctor.

Mrs. Betty Wright, wife of the appellee, testified that the injury continued to give him trouble, kept him awake at night and on one occasion when they were on a trip and got fogged in in Houston that her husband almost fainted because of the injury to his left arm. She testified that her husband was not a man who would constantly complain because of pain, but she could tell by his appearance and his actions, and what little he did say, that his left arm was severely hurting him. They became dissatisfied with the treatment of Dr. Launey and went to see two cancer specialists besides Dr. Marvin Knight.

For the medical testimony, they used Dr. George Augustus Race, a physician, medical doctor, and pathologist who was at the head of the laboratories of the Baylor Medical Center there in Dallas. He had

also been an Assistant Professor at Southwestern University, Harvard University, Duke University, and Baylor University. Dr. Race testified that he had made a careful study of the medical chart of the appellee. He further testified that he had written about two hundred publications on trauma and cancer in the Medical Journal of Forensic Sciences. He described the trauma and the cancer and the things that could cause them or could seriously aggravate a dormant condition that was traumatic or cancerous. He was told that Dr. Launey had mentioned that it was probably a lipoma; or, a lymphatic tumor. Dr. Race testified that from the record of the injury under the microscope, that was introduced into evidence, he could verify the fact that it was a cancer of the skeletal muscle. He described it as Rhabdomyosarcoma which means a cancer of the skeletal muscle or a muscle tumor. He further testified that the things that he saw would fulfill the criteria which had been put forth in literature.

Dr. Launey testified on direct examination for appellant as follows:

"Q. Now, you have indicated that there was a bruise there, does that indicate that maybe he might have also struck it.

A. It could have been just a bad sprain along with the fracture trauma".

Dr. Launey said that he was not acquainted with traumatic and cancerous diseases. He testified that he thought it was lipoma. He further testified that the sprain of his wrist was worse than the fracture.

There is a dispute between some of the members of the medical profession as to the cause of trauma and cancer. Some of the most noted experts have written that a severe injury can cause a trauma or a cancerous condition, or they can aggravate a dormant condition that was traumatic or cancerous prior to the injury. Dr. Launey further testified on cross examination as follows:

"Q. Doctor, we don't really know what the cause of cancer is, do we?

A. No, sir.

Q. Medicine has not been fortunate enough to give us an answer to that question, have they, sir?

A. That's right.

Q. Well, Doctor, how can you say, then, that trauma has no relationship to cancer when you yourself don't know the cause?

A. Well, I've seen an awful lot of sprained ankles, sprained wrists and elbows, lipomas, I have taken lots of them out, I have never taken a lipoma out that I thought was a cancer; I mean, before, I thought without questioning that this was a lipoma, and I told him that at the time.

Q. Well, like you said a minute ago on direct, Doctor you can't ever use the work 'Never' in medicine.

A. You can't, that's right.

Q. Then certainly there is a possibility, do you not agree, that this tumor could have been either aggravated or initially —

MR. KIDDER: Objection, Your Honor, —

THE COURT: Well, I haven't heard the question yet.

MR. KIDDER: Well, then I—okay.

THE COURT: Let him finish the question, and don't answer Doctor, until I have an opportunity to hear his objection.

Q. (By Mr. Collins) Would you not agree, Doctor, that it is at least possible that this tumor that we are talking about in Mr. Wright, was either aggravated or caused by, or accelerated, if you will, by this traumatic event?

MR. KIDDER: My objection, Your Honor, is—I'm sorry, have you finished the question.

MR. COLLINS: Yes, I have.

MR. KIDDER: My objection is, of course, that we are not concerned here with possibilities or could be's, we are concerned with reasonable medical probabilities; even on cross examination it's improper to ask about possibilities.

THE COURT: Overruled.

MR. KIDDER: Note our exception.

THE WITNESS: In my opinion there is no relationship between this tumor of his forearm and the injury that occurred.

Q. (By Mr. Collins) Then, are you telling us that it can never be related to a traumatic event?

A. We are talking about Mr. Wright.

Q. I understand that; I am going to get away from Mr. Wright for just a moment, and ask you this question: Are you telling this jury that a tumor can never be aggravated or accelerated or precipitated by trauma?

A. I won't say a tumor can't be aggravated, but given the same circumstances and the same findings, I feel that this was not aggravated.

Q. Yes, sir, I understand your opinion about Mr. Wright, you've been kind enough to tell us that. What I'm interested in now, though, Doctor, is your judgment, your opinion as to whether trauma can ever, under any circumstances, be related to malignant tumor?

A. Well, now, there is a school of doctors that will say that it can.

THE COURT: Wait just a minute, Doctor, listen to this question.

Q. (By Mr. Collins) I've asked you—

THE COURT: Just a minute. Mrs. Reporter, read the question back, and, Doctor, if you don't understand the question, say you don't and he will reframe it.

THE COURT REPORTER: (Reading the question)

"Yes, sir, I understand your opinion about Mr. Wright, you've been kind enough to tell us that. What I'm interested in now, though, Doctor, is your judgment, your opinion as to whether trauma can ever, under any circumstances, be related to malignant tumor."

THE WITNESS: I would have to say yes.

Q. (By Mr. Collins) It can be then?

A. Under certain circumstances."

Appellant makes some argument about the hypothetical question that was propounded to Dr. Race. A careful study of the Statement of Facts will show a difference in the questions asked by counsel for the appellant, the positive evidence, and the hypothetical question as propounded by appellee. The testimony of Dr. Race is voluminous, but it is very clear and convincing. When asked the question: "Do you have an opinion based upon reasonable medical probability whether or not this traumatic effect of May 27, 1966 led up to or precipitated the development of this tumor in our hypothetical man, do you have an opinion on that?" The Doctor answered "Yes, I think that it probably did". On cross examination he testified as follows:

"Q. In fact, the sum and substance of most of the opinion is that there is no causal relationship—the majority of the opinions, we'll put it that way?

A. I don't agree with that. May I state how I feel about that?

Q. Yes, surely.

A. The people who read in this field and study it, lean over backwards to ask for all of the proof that they can get in this regard. They set up very stringent criteria, and hence, all of these things that I have enumerated; and if they fulfill those, such an eminent man as Dr. Warren, a professor at Harvard, came to

the conclusion that in instances trauma can cause cancer, I believe."

Appellant argues that there are seven criteria that "must be met" to show that an injury has caused a cancer. This doesn't seem to follow the law. A metastatic cancer of the lung would not spread to the arm because of an injury. We can not find in the record of any skin lesions or eiologic agent of cancer caused by a causative agent of a cancer that did not exist prior to the injury.

There is an extremely interesting article that has been published in the Southern Methodist Bar Journal (23 SWLF 622) (Oct. 19, 1969) by David C. Musselwhite, attorney at law, Dallas, Texas, on "Medical Causation Testimony in Texas: Possibility vs. Probability". In the article, Mr. Musselwhite points out that: "Distinction should always be drawn between ordinary negligent cases, malpractice cases, and workmen's compensation cases, since the proof required in each is not necessarily the same". It would be wonderful if every lawyer in Texas would read this article. Under the workmen's compensation case at hand there is sufficient evidence to support the jury findings. T.E.I.A. v. Steadman (Tex.Civ.App., 1967), 415 S.W.2d 211, w. r., N.R.E. Aetna Casualty Company v. Scruggs (Tex.Civ.App., 1967), 413 S.W.2d 416, N.W.H. The appellant and the appellee both cite Insurance Company of North America v. Myers, Tex.Sup.Ct., 1966, 411 S.W.2d 710. The Supreme Court reversed and rendered that case on the theory that the only medical testimony to support the jury finding that a brain tumor was a producing cause of her death was a possibility; not a medical probability. In the Supreme Court case of Insurance Company of North America v. Kneten, 1969, 440 S. W.2d 52, the Supreme Court held that despite a doctor's failure to testify that causal connection between job connected occurrence employee's disability was reasonably probable, but allowed recovery because of evidence of prompt onset of attack following an occurrence competent to affect adversely a defective heart. This decision went off on a theory of a "strong possibility". See, also, McCormick & Ray, Texas Law of Evidence, Vol. 2, page 238, section 1403. This is on asking hypothetical questions. The points are overruled.

From what has been said in the foregoing opinion, also takes care of the 3rd, 4th and 5th point of error because there was a reasonable medical probability that the criteria was met, the evidence is sufficient to support the jury's findings, and is not manifestly wrong and unjust. Points 3, 4 and 5 are overruled.

The judgment of the trial court is affirmed.